# Moragne *v.* The City of Gadsden.

## *Ejectment.*

(Decided Jan. 10, 1911.   54 South. 518.) ·

1. *Dedication; Nature.*—The dedication of land to the public use consists in the intentional donation by the owner of the land to some public purpose, and an acceptance by the public.

2. *Same; Essentials; Intention.*—A dedication may be made either verbally or in writing, and by one or a series of acts, the intention to dedicate being the determining factor.

3. *Same; Presumption.*—Where land has been used for a public purpose continuously and without objection for more than twenty years, a presumption of dedication arises; but if the use has been permissive or contested, the presumption will be rebutted, since it is really based on an analogy to prescription.

4. *Same; Platting; Designation as a Park.*—The mere fact that the owner omits to designate certain lands as a park or common when platting them for a city will not prevent a dedication thereof to the city for that purpose.

5. *Same; Evidence; Jury Question.*—The evidence in this case stated and examined and held to require a direction of the verdict for the defendant on the theory of a dedication.

APPEAL from Etowah Circuit Court.

Heard before Hon. JOHN W. INZER.

Ejectment by Joe S. Moragne against the city of Gadsden, for a plot of ground alleged to have been dedicated to the city as a park or common. Judgment for defendant and plaintiff appeals. Affirmed.

CULLI & MARTIN, for appellant. The plaintiff having shown a prima facie right to recover, the obligation passed to the defendant to carry the burden of showing the dedication or adverse possession.—*Warrior R. C. & Co. v. Ala. St. L. Co.*, 154 Ala. 141. The court erred in giving the affirmative charge to the defendant as there was sufficient conflict in the evidence to require a submission of the question to the jury.—*Peters v. So.*

*Ry. C.*, 135 Ala. 537; *L. & N. v. Lancaster*, 121 Ala. 471. The plaintiff showed a good paper title to recover for all his co-tenants.—*Lacroix v. Malone*, 157 Ala. 439; *Marshall v. Palmer*, 50 Am. St. Rep. 842. On the question of dedication and as showing that there was no sufficient dedication in this case, or that if the presumption of dedication arose it was rebutted, counsel cite the following cases: *Stacy v. Glenn Ellen*, 223 Ill. 456; *Marion v. Skillman*, 127 Ind. 130; *E. Bir. R. Co. v. B. & F. Co.*, 49 So. 488; *Tutwiler v. Kendall*, 113 Ala. 664; *City of San Francisco v. Groat*, 65 Am. St. Rep. 155; *Benton v. City of St. Louis*, 129 Am. St. Rep. 578, and note; *Poole v. Lake Forest*, 238 Ill. 305; *Mitchell v. Denver*, 33 Col. 37; *Marsh v. Village*, 163 Ill. 401; *Smith v. Opelika*, 51 So. 822; *Evans v. S. & W. R. R. Co.*, 90 Ala. 54.

O. R. HOOD, and M. C. SIVLEY, for appellee. Under all the evidence in this case the court properly directed a verdict for the defendant on the theory of prescription and dedication. Certainly, the presumption of dedication was created.—*Steele v. Sullivan*, 70 Ala. 589. The city enjoyed the uninterrupted use and possession of the land for a period longer than is required to bar recovery on account of prescription.—*Harper v. The State*, 109 Ala. 66; *McDade v. The State*, 95 Ala. 28; *Forney v. Calhoun County*, 84 Ala. 215; *Hoole v. Attorney General*, 22 Ala. 190. It was competent to show the general repute as to the title of the property all these years.—*Long v. Palmer*, 81 Ala. 388; 1 Greenl. Sec. 128; 2 Wigmore, Secs. 1583-1608; *Jelleson v. Patterson*, 132 Ala. 674. The period covered by the Civil War is not deducted where more than twenty years have elapsed.—*Harrison v. Heflin*, 54 Ala. 552.

McCLELLAN, J.—Dedication of land to public use consists in the intentional donation thereof by the owner to some public object or purpose, and the acceptance therefor by the public. "It may be done verbally or in writing, by a single act or series of acts, if clear and unequivocal, as indicating the owner's intention."— *Bessemer Land Co. v. Jenkins,* 111 Ala. 135, 148, 18 South. 565, 568, 56 Am. St. Rep. 26; *Forney v. Calhoun County,* 84 Ala. 215, 4 South. 153; *Steele v. Sullivan,* 70 Ala. 589. The intent of the owner is a vital factor in determining dedication vel non.—*East B'ham Realty Co. v. B'ham Machine & Foundry Co.,* 160 Ala. 461, 467, 49 South. 448. Acceptance by the public may be manifested, among other ways, by long and uninterrupted use without questioning.—Authorities, supra. A presumption of dedication, even by express grant, will be indulged where the use for public purposes has been enjoyed, continuously and without interruption and without objection, for more than 20 years.—*Hoole & Paulin v. Attorney General,* 22 Ala. 190; *Rosser v. Dunn,* 66 Ala. 89, 94; *Steele v. Sullivan, supra; Lewman v. Andrews,* 129 Ala. 170, 175, 29 South. 692; *Smith v. Inge,* 80 Ala. 283; *N. O. & S. R. R. Co. v. Jones,* 68 Ala. 48; *Cochran v. Purser,* 152 Ala. 354, 44 South. 579; 9 Ency. Law, pp. 66, 67; 13 Cyc. pp. 478, 479, stating this and divergent (in other states) views.

In *Hoole & Paulin v. Attorney General, supra,* it was said: "As a general rule, the mere fact of acquiescence on the part of the owner in the use and enjoyment of the way as a public road would not create the presumption of dedication, *until the period of twenty years,* without some clear and unequivocal act on the part of the owner, amounting to an explicit manifestation of his intention to make a permanent gift of the road to the public." (Italics supplied.) In *Rosser v.*

*Dunn* this court said,: "The testimony of plaintiff's witness tended to show there had been a way open to the public as a highway, and so used, for near or quite 50 years. If this user had existed for 20 years of continuous use, the presumption would arise that the road had been established by law, or that it was dedicated to the public by the owner of the soil." In a phase of the matter the bases of the implication—the presumption— are: First, that the user must have been in such manner as did not consist with a mere permissive (by the owner) enjoyment of the land by the public; and, second, the right of use must not have been contested or interrupted.—*Smith v. Inge, supra; Gage v. M. & O. R. R.,* 84 Ala. 224, 4 South. 415; *Sultzner v. State,* 43 Ala. 24, 30; *Steele v. Sullivan,* 70 Ala. 594, *supra.* In the last cited decision it was remarked: "It has been held on this principal (that in course of reiteration) that a user of 20 years will not raise a prescription, where it appears that the right had always been a subject of contention." Since the presumption arises out of user, as before stated, it is a necessary consequence that in respect of continuous, uninterrupted and unobjected to public user the alleged dedicator, or his successors in right, may rebut this basis of the presumption "by showing that the right of user was always contested, or constantly interrupted by the owner."—*Smith v. Inge, supra,* at page 287 of 80 Ala.; *Harper v. State,* 109 Ala. 66, 19 South. 901. As appears, the several principles of law stated are settled in this state, have become rules of property, and recourse to the adjudication of learned courts elsewhere pertinent to the indicated inquiries presented by this appeal is not to be had.

The subject-matter of this litigation is a park or common in the city of Gadsden. Plaintiff's (appellant's)

predecessor in asserted right was Joseph Hughes. He died in 1865. This plot of land, with much more, was conveyed by the United States in 1845 to one Rhea. In 1846 Rhea conveyed this, with other lands, to Joseph Hughes. Hughes was an early settler in Gadsden. This plot then lay between the town proper, as it progressed in material construction, and the public landing for Gadsden on the Coosa river. The plot sued for does not appear to run to the bluff above the river at that point, but is triangular in shape (if rightly pictured in mind). Across it from a very early date a road from the settlement toward the ferry near the landing as well as toward the landing; and somewhat later what was known as Broad or Railroad street was extended across this plot in the direction and for the public purposes indicated. No question of the rightfulness of the use of this way seems ever to have been made. No fence or other obstruction ever hindered or forbade access to the plot in question, other than that put there by the city in 1887, to which fact reference will be later made. Witnesses for the city deposed to acts by the public authorities of Gadsden, such as cleaning up and care taking of the place, from at least as far back as, if not much earlier than, the late 60's; and those witnesses also narrated acts of the public generally in respect of the land of which this angular plot is a part, such as its use for public occasion, speakings, and barbecues, and as the camping ground, hitching place, and wagon yard of travelers to or by Gadsden in the days when road and water travel and conveyance was the rule. These acts evince an unmistakable purpose and intent on the part of the public to claim and enjoy the exclusive use of those premises for public purposes. The uses as described by the witnesses for the city were entirely inconsistent with recognition of any mere permissive (by the owner)

[Moragne v. The City of Gadsden.]

use of the land in controversy. It is inconceivable that the owner could have assumed in the light of the public acts in respect of this place enumerated in the evidence that such uses were made as upon his favor, and not against his rights. Nor could he have been ignorant of such acts so public and covering so great a period of time. In 1887 the city fenced this property. It seems to have done so as the result of general talk or rumors in the community, to the effect that the city had no right to or upon the premises. Twenty-two years elapsed between the date of the erection of the fence and the institution of this action. No demand or notice or act or other tangible questioning of the city's right to the use of the plot appears to have been ever made or given.

The successive owners do not appear to have ever assessed this plot for taxation. So far as the evidence shows, no inclosure of any kind ever marked the boundaries of the plot in whole or in part until 1887, when the city erected the fence. From 1846 to 1865, a period of 19 years approximately, Joseph Hughes lived in Gadsden, and no act of his is shown wherefrom it could be infered that the plot was a reservation to private uses. He, as indicated, is not shown to have submitted this plot to taxation. The location of the plot with reference to the building town has been described. That an owner should leave untouched, unnoticed, in any form and for so long a period, so prominent and so necessarily increasingly valuable a plot of land, located between a nearby town and a river of consequential use and service, is, it may be well said, consistent only, when the public uses described in the evidence are recurred to, with an intent to commit the property so ignored as a subject of private ownership and profit to the public benefaction. A copy of a map of Gads-

[Moragne v. The City of Gadsden.]

den as originally laid out is exhibited in the transcript. The original map is traced back positively in the evidence to the year 1857. This copy was made in 1888. In connection with it the testimony leaves no room for doubt that the original of the map was the means of designation in conveyances of lots, streets, etc., in Gadsden, many years before the death of Joseph Hughes in 1865. This map is important evidence on the issue with which we are concerned. The appellant finds in it the premise for an earnest argument in refutation of the city's insistence of presumptive dedication. That part of the map east of Second street thus appears:

The angular plot in controversy abuts on Front (or First) street and on Chestnut street, coming to a point at the south line of extended Broad or Railroad street and widening symmetrically down to Chestnut street. According to sketch in brief for appellant, the line forming its eastern boundary is the section line between sections 4 and 3. From the map it appears with perfect certainty that the original plotting of the townsite embraced territory east, on the north, and on the south of the land in suit. Indeed, in the block south of Chestnut street there are 12 lots numbered. The east boundary of lots 36 and 113 in that block conforms to the line coming down from between sections 4 and 3 before mentioned. It also appears from the map that the next numbered lot to 36 on the south of the plot in question is 37, lying and plotted north of the litigated plot and fronting on Pine street to its south and east of the line dividing as aforesaid, sections 4 and 3. The plot in dispute is a part of the territory west from the "Public Landing" noted on the map. Now, north of the words "Public Landing," is a space, nearly square, in which is written, "Reserved Undivided." It will be noted, because important, that the south line of this reserved, undivided area is clearly a continuation of the north line of Railroad or Broad (as latterly called) street, and is true to its direction. Again, it will be noted that the section line mentioned intersects the block on the extreme right of the map abutting on Second, Front (or First), and Pine streets, leaving part of the southeast corner lot in that block, east of the section line, and Front or First street is continued beyond Pine street at that point. These comments are drawn, as appears, from the map's face. Reference to it will give these suggestions added force and impressiveness as bearing on the matter under consideration.

From these points of recorded fact these conclusions cannot, we think, be escaped: First, that the original plotting of the townsite was not confined to section 4, but embraced the territory as indicated in section 3; second, that, while the line between sections 3 and 4 commended the special attention of the original plotters of the site, yet it did not control the plotting as an integer; and, third, that the only reservation made or intended to be made was explicitly made; and, in picturing it on the original plotting, the south line consisted with the extension of the north line of Railroad or Broad street to the crest of the river bank or bluff on the east, and on a line approximately north and south with the east line of the reservation.

If Joseph Hughes did not in fact own the land on which the reservation was made, unquestionably, according to the original plotting, he joined with his neighbor on the east, next the river at that point, to lay out and plot a townsite, and they together created out of their respective properties the plotting evidenced by the map (copy) before us. If so, as an evidential fact, it cannot be a matter of small moment on the trial of an issue dependent for solution upon evidence of facts and acts from a remote and largely faded past that the joint plotting shows reservation on the one plotting, the one map, by his neighbor and none by him. It is entirely reasonable, as we have indicated, to assume, after more than 50 years have passed without any act or declaration of claim of ownership, that the omission to reserve, and to number, and divide into lots, when named streets touched the general area on three sides, and, on the other, a river bank or bluff, meant nothing else as indicative of the owner's intention that the unnoted area should be and was to be devoted to public use. A second view of the map must

[Moragne v. The City of Gadsden.]

convince that there was a reason and an idea of public convenience, and maybe necessity, suggesting the donation of the area indicated to public use. The long, uninterrupted use and improvement of the way from the town proper to the wharf and ferry manifests the reason and the idea just mentioned. The views expressed do not lead to any denial of ferry rights early owned by Joseph or Gabriel Hughes or others at that point on the Coosa River. From the evidence aside from the map it appears that there is a high bank on the west of the river along this way. The map clearly denotes the crest of the bank, and does not include in its platted area the slope of the bank to the river. The omission to denominate the area, a part of which is in controversy, a park or common, cannot be controlling on the issue, under the evidence, as it was held to be in *East Birmingham Realty Co. v. Birmingham Machine Co.,* 160 Ala. 461, 471, 472, 49 South. 448.

Without prolonging the discussion of the evidence, we feel constrained to hold, after careful consideration of the whole evidence, in the light of the rules of law to which we first adverted, that the city was entitled to the affirmative charge given by the court, and so on the ground at least of presumptive dedication of the land sued for to public uses, there being no sort of doubt of acceptance thereof by the public concerned.

We need hardly add that the conclusion attained is not rested upon any notion of adverse possession for the statutory, requisite, period to invest title. That view might be strongly supported, on the evidence here; but the ground indicated suffices to determine, after all due caution, the rights of the litigants in this cause. The defendant being entitled to the affirmative charge on the theory stated without reference to possibly illegal evidence admitted over plaintiff's objections, errors

[Lyons, et al. v. Stickney.]

(if so) thus intervening were without prejudice to the plaintiff.

The judgment is affirmed.

Affirmed.

DOWDELL, C. J., and SIMPSON and MAYFIELD, JJ., concur.